**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID H. SMITH, | ) | CASE NO.  1:16-cv-01476 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| *Acting Comm'r of Social Security,* | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff David H. Smith (hereinafter "Plaintiff"), challenges the final decision of

Defendant Carolyn W. Colvin, Acting Commissioner of Social Security (hereinafter

"Commissioner"), denying his applications for a Period of Disability ("POD"), Disability

Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of

the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. ("Act").   This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).   This case is before the undersigned United States

Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.   For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

## I.  Procedural History

On July 12, 2013, Plaintiff filed applications for POD, DIB, and SSI, alleging a disability onset date of January 15, 2008. (Transcript ("Tr.") 194-206).   The applications were denied initially and upon reconsideration, and Plaintiff requested a hearing before an ALJ. (Tr. 141-162). Plaintiff participated in the hearing, was represented by counsel, and testified. (Tr. 35-63).   A vocational expert ("VE") also participated and testified. (*Id*.)   On December 2, 2015, the ALJ found Plaintiff not disabled. (Tr. 29).   On April 27, 2016, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1-3). On June 15, 2016, Plaintiff filed a complaint challenging the Commissioner's final decision. (R. 1).   The parties have completed briefing in this case. (R. 14 & 16).

Plaintiff asserts the following assignments of error: (1) the ALJ erred by failing to ascribe sufficient weight to the opinion of Plaintiff's treating psychiatrist; and (2) the ALJ erred by finding that Plaintiff is capable of performing a significant number of jobs in the national economy. (R. 14).

## II.  Evidence

### A. Personal and Vocational Evidence

Plaintiff was born in 1980 and was 28-years-old on the alleged disability onset date. (Tr. 27). He had a limited education and was able to communicate in English. (*Id*.)   He had no past relevant work. (*Id*.)

2

**B. Relevant Medical Evidence**[1]

   **1.  Treatment Records**

On June 25, 2012, Plaintiff began treatment with William Fikter, M.D. (Tr. 505-506). Plaintiff reported a two-year history of heroin abuse, which was preceded by two years of opiate use. (*Id*.)   The latter were initially prescribed for pain management of a meniscal tear. (*Id*.)   On mental status examination, Plaintiff was appropriately groomed and dressed; he had soft, spontaneous, logical, and goal-directed speech; he was somewhat anxious; he had a linear thought process; he had no suicidal or homicidal thoughts; and, he appeared to be of average intelligence (Tr. 506).   Dr. Fikter diagnosed opiate dependence, anxiety NOS, and ascribed Plaintiff with a global assessment of functioning (GAF)[2] score of 40. (*Id*.)   He also recommended that Plaintiff begin Suboxone, a partial hospitalization program, and then intensive outpatient therapy (IOP) including attending four AA meetings per week. (*Id*.)

On July 2, 2012, Dr. Fikter noted that Plaintiff was "more edgy than previously." (Tr. 507). Otherwise, on mental status examination, Plaintiff remained unchanged. (*Id*.)   Plaintiff was continued on Suboxone and was also prescribed Trazodone. (*Id*.)   His diagnosis and GAF score also remained unchanged. (*Id*.)

---

[1]  The recitation of the evidence is not intended to be exhaustive.   It includes only those portions of the record cited by the parties in their briefs *and* also deemed relevant by the Court to the assignments of error raised.

[2]  The GAF scale reports a clinician's assessment of an individual's overall level of functioning.   An individual's GAF is rated between 0-100, with lower numbers indicative of more severe mental impairments. A GAF score between 31 and 40 indicates some impairment in reality testing or communication or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood.   A person who scores in this range may have illogical or irrelevant speech, and may avoid friends, neglect family, and be unable to work.   *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric Ass'n, 4th ed. revised, 2000) (DSM-IV).   Notably, an update of the DSM in 2013 eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

On July 23, 2012, Plaintiff told Dr. Fikter he was "doing okay." (Tr. 508).   He stated that he has been attending IOP and had attended some AA meetings. (*Id.*)   He expressed concern related to his ability to concentrate and focus. (*Id.*)   His diagnosis remained unchanged. (*Id.*)   He was given a prescription for Wellbutrin. (*Id.*)   At a follow-up one week later, Plaintiff indicated that he was tolerating Wellbutrin without any side effects, but had not noticed any benefit either. (Tr. 510). There was no change on mental status examination, and no change in Plaintiff's diagnoses. (*Id.*)

On August 27, 2012, Plaintiff told Dr. Fikter that he was "doing alright," had been attending IOP consistently, was tolerating his medication without side effects, and had recently attended less AA meetings "because he has been working a lot to pay down debt." (Tr. 511).   Mental status examination and Dr. Fikter's diagnostic impression was largely unchanged, except that Plaintiff appeared a bit more edgy than previously . (*Id.*)   A ten-day prescription for Topiramate was added. (*Id.*)

On October 4, 2012, Plainitff reported marked concentration problems and feeling excessively down with the Topamax. (Tr. 513).   He had increased discord with his significant other to the point where the police were called. (*Id.*)   Dr. Fikter altered Plaintiff's diagnosis from anxiety NOS to bipolar disorder NOS, and also diagnosed antisocial personality disorder. (*Id.*) He continued to diagnose opiate dependence, and Plaintiff's GAF remained at 40. (*Id.*)   Dr. Fikter added a prescription for Seroquel. (*Id.*)

On October 15, 2012, Plaintiff reported feeling "[a]bout the same," with significant ups and downs, a lot of frustration, and a lot of social avoidance. (Tr. 514).   Dr. Fikter noted that Plaintiff was "somewhat edgy," and became "more guarded and shut down as questions are asked." (*Id.*) Cognitively he was unchanged. (*Id.*)   Dr. Fikter discontinued Wellbutrin and added Depakote.

(*Id*.) His diagnoses remained unchanged. (*Id*.)

On November 12, 2012, Plaintiff reported that Depakote had not been helping, but he tolerated it without side effects. (Tr. 516).   He continued to report considerable conflict at home, as well as ongoing migraines. (Tr. 516).   Dr. Fikter again noted that Plaintiff was "somewhat edgy," and became "more guarded and shut down as questions are asked." (*Id*.)   His diagnoses and prescriptions remained unchanged. (*Id*.)

On December 3, 2012, Dr. Fikter noted Plaintiff's mental status was similar to previous visits—"somewhat angry, but not overtly hostile." (Tr. 517).   His diagnoses and prescriptions remained unchanged, though Plaintiff was referred back to IOP. (*Id*.)

On January 2, 2013, Plaintiff was somewhat calmer with less frequent anger episodes. (Tr. 519).   Dr. Fikter's diagnoses and prescribed treatment remained largely unchanged, though Depakote was increased. (*Id*.)

On January 31, 2013, Plaintiff was calmer than previously, though things remained "very chaotic at home" according to Plaintiff. (Tr. 520).   Plaintiff was more forthcoming than previously. (*Id*.)   Dr. Fikter's diagnoses and prescribed treatment remained largely unchanged, though Seroquel was increased. (*Id*.)

On February 25, 2013, Plaintiff indicated that he had been doing reasonably well, though he continued to have occasional altercations with his wife. (Tr. 522).   Dr. Fikter noted that Plaintiff appeared progressively calmer, and noted that Plaintiff's risk assessment appears to be decreasing overall. (*Id*.)   His diagnoses and prescriptions remained unchanged. (*Id*.)

On March 28, 2013, Plaintiff reported "ongoing chaos in the home." (Tr. 524-525). Nevertheless, Plaintiff felt his mood was progressively calmer and more stable. (*Id*.)   He was separating from his wife and indicated he would not be living with her or the children soon. (*Id*.)

Dr. Fikter's diagnoses and prescribed treatment remained unchanged. (*Id*.)

On April 29, 2013, Plaintiff reported being very anxious and agitated, and stated that he and his family had been evicted from their home. (Tr. 526).   He was alternating between living with his step-father and with a friend. (*Id*.)   He was trying to separate from his wife, who occasionally still lived with him. (*Id*.)   Dr. Fikter continued to note that Plaintiff was "the same as previously, calm, cooperative." (*Id*.)   His diagnoses and prescriptions remained largely unchanged, though Seroquel was increased. (*Id*.)

On May 23, 2013, Plaintiff indicated that things had been "pretty rough," living with various family members. (Tr. 527).   He also reported more migraine headaches. (*Id*.)   On mental status examination, Dr. Fikter noted that Plaintiff was appropriately groomed and dressed; was cooperative; made good eye contact; walked with normal station and gait; had soft, spontaneous, logical, and goal directed speech; had a constricted affect to the anxious and depressed range; had linear thought process and thought content was negative for suicidal, homicidal, and psychotic thoughts; was alert and oriented x3; had fair recall and average intelligence; and, had fair insight and judgment. (*Id*.)   Plaintiff's risk assessment was low. (*Id*.)   His diagnoses and prescriptions remained largely unchanged, though Seroquel was again increased. (*Id*.)

On June 29, 2013, Plaintiff was "doing reasonably well despite ongoing stressors." (Tr. 529.) Despite ongoing family stressors, Plaintiff's anger had been in "relatively good control," he attended four AA meetings per week, and provided adequate parenting for his children. (*Id*.)   Dr. Fikter's mental status examination of Plaintiff was largely unchanged from the previous visit, as were his diagnoses and prescriptions. (*Id*.)

On July 18, 2013, Plaintiff stated he was attending four AA meetings per week, including six the previous week. (Tr. 531).   He and his wife were both attending a program through Job and

Family Services to help them re-establish independent living. (*Id*.)   He reported eating and sleeping well, with no side effects from his medication. (*Id*.)   Dr. Fikter's mental status examination remained the same, as were his diagnoses and prescriptions. (*Id*.)

On August 15, 2013, Plaintiff was still living with his step-father and reported "doing OK generally."   (Tr. 532).   Plaintiff had been doing well on his current medications, but had briefly stopped taking them because of recurrent emesis. (*Id*.)   Dr. Fikter's mental status examination of Plaintiff was largely unchanged from the previous visit, as were his diagnoses and prescribed treatment except that Depakote was decreased. (Tr. 532-533).

On September 16, 2013, Plaintiff reported that he had been attending AA meetings every other day. (Tr. 534).   Plaintiff's significant other was pregnant, which made him anxious because he was early in recovery and thought "things [were] chronically stressful enough before adding another child to the mix."[3] (*Id*.)   Plaintiff was largely unchanged from the previous visit except that he seemed more down than at his last few appointments. (*Id*.)   Dr. Fikter's diagnoses and prescribed treatment remain unchanged. (Tr. 534-535).

On October 14, 2013, Plaintiff reported to Dr. Fikter that he was attending four AA meetings per week. (Tr. 598).   Dr. Fikter's mental status examination results, diagnoses and prescribed treatment remain unchanged. (Tr. 598-99).

On December 4, 2013, Plaintiff reported ongoing social stressors. (Tr. 603-604).   Dr. Fikter's mental status examination results, diagnoses and prescribed treatment remain unchanged except for an increase of Seroquel. (*Id.*)

On January 11, 2014, Plaintiff indicated he was sleeping and eating well, attending four to

---

3 Dr. Fikter's treatment notes are unclear.   He initially notes that Plaintiff's "paramour" is pregnant, and later notes that Plaintiff's wife is pregnant with a fifth child. (Tr. 534).   It is not entirely clear whether the reference to the paramour is to Plaintiff's wife or another individual.

five AA meetings per week, and that things were stable at home. (Tr. 605).   Plaintiff asked Dr.

Fikter about focus and concentration problems. (*Id*.)   Dr. Fikter's mental status examination

results remained unchanged. (*Id*.)   Dr. Fikter's diagnostic impression ruled out Attention Deficit

Hyperactivity Disorder but was otherwise unchanged. (Tr. 606).   Prescription medication

remained unchanged except for an increase of Seroquel and the addition of Concerta. (*Id*.)   A

follow-up on January 27, 2014, showed minimal changes. (Tr. 647).

On February 17, 2014, Plaintiff was seen by Dr. Fikter. (Tr. 648-649).   Again, there were no

significant changes, except that Dr. Fikter noted Plaintiff "seems more down than the last several

appointments." (Tr. 648).

On March 19, 2014, Plaintiff told Dr. Fikter that he had been increasingly anxious. (Tr. 656).

The treatment notes did not contain a mental status examination. (*Id*.)   Plaintiff's diagnoses and

prescribed treatment remain unchanged. (*Id*.)

On April 16, 2014, Plaintiff reported chronic conflict with his wife related to parenting. (Tr.

663).   He reported a stable mood, but decreased energy. (*Id*.)   Plaintiff's diagnoses and

prescriptions remained unchanged. (*Id*.)

On November 12, 2014, Plaintiff told Dr. Fikter that he had only been taking Suboxone due

to a lack of insurance coverage. (Tr. 708).   Again, the treatment notes did not contain a mental

status examination. (*Id*.)   Plaintiff's diagnoses remained unchanged and Plaintiff's prescriptions

were restarted—a prescription for Latuda was added while Seroquel was omitted. (*Id*.)

On March 18, 2015, Plaintiff reported getting a job, doing the same as previously, being back

on his medications, and separating from his wife. (Tr. 709).   Treatment notes did not contain a

mental status examination. (*Id*.)   Dr. Fikter's diagnoses and prescribed treatment remained

unchanged. (*Id*.)

8

On April 13, 2015, Plaintiff indicated to Dr. Fikter that he was essentially the same, living with his step-father, and was reclusive/socially avoidant. (Tr. 710).   Dr. Fikter noted that Plintiff "now has a lawyer to help him with his disability application." (*Id.*)   Dr. Fikter's diagnoses and prescribed treatment remained unchanged. (*Id.*)

### 2.   Medical Opinions Concerning Plaintiff's Functional Limitations

On July 20, 2011, Matthew Paris, Psy. D., performed a consultative psychological evaluation relating to Plaintiff's claim for disability. (Tr. 314-323).   Plaintiff's chief complaints were anxiety, depression, anger management, mood swings, and overall irritability. (Tr. 314). Plaintiff reported that he prefers to keep to himself, was in specialized classes for the majority of his life, dropped out of school in the eighth grade at age 16, cannot read or write, has significant concentration and memory problems, has problems understanding things, and has difficulties working in a group and is agitated around other people. (Tr. 314-317).   With respect to activities of daily living, Plaintiff reported having difficulty with cooking and preparing food, cleaning and doing laundry, being able to manage his money, and shopping. (Tr. 318).   He stated that he is able to drive a car and take care of his self-hygiene and grooming. (*Id.*)   Dr. Paris noted that Plaintiff had not shaved in some time, that his hair appeared unwashed, but that Plaintiff was not malodorous. (*Id.*)   Dr. Paris observed that Plaintiff's speech was understandable and devoid of rapid or pressured speech; that Plaintiff's thought processes were coherent and goal directed without evidence of hallucinations, delusions, or paranoid thought patterns; and that Plaintiff did not demonstrate obsessive thinking and/or compulsive behaviors. (Tr. 319).   Plaintiff also exhibited a full range of affect with his primary affect being depressed, which was consistent with his reported mood. (*Id.*)   While Plaintiff reported vomiting three times en route to the evaluation, Dr. Paris noted Plaintiff did not demonstrate significant autonomic arousal symptoms or

physiological symptoms of anxiety during the evaluation. (*Id*.)   With respect to sensorium and cognitive functioning, Dr. Paris noted that Plaintiff was alert and oriented to person, place, time, and situation; concentration and attention were mildly impaired; Plaintiff had difficulty with simple arithmetic calculations and his serial threes; recent and remote memory skills were also mildly impaired; intellectual functioning was in the borderline range of functioning when compared to others; and, his general fund of information was limited. (*Id*.)   Dr. Paris did not perform any psychological testing. (*Id*.)   Dr. Paris diagnosed mood disorder NOS, anxiety disorder NOS, intermittent explosive disorder, learning disorder NOS, antisocial personality features, and ascribed a GAF score of 51, indicative of moderate symptoms. (Tr. 320).   It was Dr. Paris's opinion that Plaintiff had moderate-to-significant deficiencies in understanding, remembering, and carrying out instructions; moderate-to-significant limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks; no limitations in his ability to perform simple tasks; significant deficiencies in his ability to respond appropriately to supervision and to coworkers in a work setting; and, significant deficiencies in responding appropriately to work pressures in a work setting. (Tr. 321-322).

On September 25, 2013, Plaintiff was seen by Amber L. Hill, Ph.D., for a consultative psychological evaluation. (Tr. 537-546).   Dr. Hill noted that Plaintiff was dressed appropriately and well groomed, had normal posture and motor behavior, but had poor eye contact. (Tr. 543). Plaintiff's speech intelligibility was fluent, quality of voice was clear, and he demonstrated adequate expressive and receptive language skills. (*Id*.)   His thought processes appeared coherent and goal directed with no evidence of hallucinations, delusions, or paranoia. (*Id*.)   Plaintiff's affect "appeared somewhat restricted, flat, and depressed, but was appropriate in speech and

10

thought content.   His mood was dysthymic." (*Id*.)   Dr. Hill did not observe any anxiety. (*Id*.) Plaintiff's sensorium appeared clear; he was oriented to person, place, and time; his attention and concentration appeared intact; he was able to complete simple calculations; his recent and remote memory skills seemed primarily intact; but, he did appear to be a poor historian. (*Id*.)   She rated Plaintiff's intellectual functioning as falling within the borderline range and observed that his general fund of information appears somewhat limited. (*Id*.)   Dr. Hill diagnosed mood disorder NOS, anxiety disorder NOS, opioid, alcohol, and cannabis dependence all in full sustained remission, and ascribed a GAF score of 53, indicative of moderate symptoms. (Tr. 544).   It was Dr. Hill's opinion that Plaintiff appeared to have the ability to understand, remember, and carry out instructions; was able to maintain attention and concentration and perform simple and multi-step tasks, but may have some limitation due to a lack of motivation; was likely limited in his ability to respond appropriately to supervisors and to co-workers within a work setting; and, may have some limitations in his ability to respond appropriately to work pressures within a work setting based on his traits of antisocial personality disorder. (Tr. 546-547).

On October 9, 2013, Plaintiff's counselor, Kathleen Allen, a professional clinical counselor, completed a report for the Disability Determination Services noting she last saw Plaintiff on September 24, 2013. (Tr. 565-567).   Ms. Allen indicated that Plaintiff suffered from major depressive disorder, low self-esteem, feelings of hopelessness, past suicide attempts, withdrawal from social interaction, loss of interest in pleasurable activities, severe anxiety in social settings, and maladaptive core beliefs. (Tr. 566).   She opined that Plaintiff's inability to tolerate frustration leads to agitation, anger, and withdrawal, noting he has been unable to hold a job for more than a few weeks. (Tr. 567).

On October 10, 2013, state agency psychologist, Todd Finnerty, Psy.D., reviewed Plaintiff's

medical records, finding evidence of an affective disorder, substance addiction disorder, and personality disorder.   He opined that Plaintiff would have moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and that Plaintiff did not have repeated episodes of decompensation of an extended duration. (Tr. 86).   Dr. Finnerty completed a mental residual functional capacity assessment, finding that Plaintiff was not significantly limited in his ability to remember locations and work-like procedures or in his ability to understand, remember, and carry out very short and simple instructions. (Tr. 89).   However, Plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions and was moderately limited in his ability to maintain attention and concentration for extended periods. (*Id*.)   Plaintiff was not significantly limited in his ability to perform activities within a schedule, maintain regular attendance, or be punctual within customary tolerances. (*Id*.)   He could sustain an ordinary routine without supervision, work in coordination or in proximity to others, and make simple work-related decisions. (Tr. 90).   Dr. Finnerty opined that Plaintiff was moderately limited in his ability to complete a normal workday or workweek without interruptions from psychologically based symptoms, but could maintain attention, concentration, persistence and pace for simple tasks without a fast pace. (*Id*.)

On January 27, 2014, state agency physician, Kristin Haskins, Psy.D., mostly affirmed Dr. Finnerty's findings. (Tr. 117-118, 121-122).

On April 13, 2015, treating psychiatrist Dr. Fikter completed a mental residual functional capacity assessment, indicating that he saw Plaintiff on a monthly basis since June 25, 2012. (Tr. 705).   Dr. Fikter checked a box indicating that Plaintiff would experience symptoms severe enough to interfere with attention and concentration for simple tasks over twenty-five (25) percent

12

of an eight-hour work day. (*Id.*)   If placed in a competitive work situation, Dr. Fikter predicted that Plaintiff would be absent numerous days per month, but did not explain why. (Tr. 706).   Dr. Fikter opined that Plaintiff was markedly to extremely limited in his ability to perform all work activities included on the RFC questionnaire. (Tr. 706-707).

### III. Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).   A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).   First, the claimant must demonstrate that he/she is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b).   Second, the claimant must show that he/she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c).   A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.

20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's

impairment does prevent him from doing his past relevant work, if other work exists in the national

economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g),

404.1560(c), and 416.920(g).

### IV. Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security
   Act through June 30, 2009.

2. The claimant has not engaged in substantial gainful activity since January
   15, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et
   seq.*).

3. The claimant has the following severe impairments: right knee degenerative
   joint disease, status post partial medial meniscectomy; learning disorder;
   bipolar disorder; antisocial personality disorder; and polysubstance
   dependence current in alleged remission (20 CFR 404.1520(c) and
   416.920(c)).

4. The claimant does not have an impairment or combination of impairments
   that meets or medically equals the severity of one of the listed impairments
   in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d),
   404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that
   the claimant has the residual functional capacity to perform light work as
   defined in 20 C.F.R. § 404.1567(b) and 416.967(b) except that he should
   never climb ladders, ropes or scaffolds; and can occasionally climb ramps
   or stairs, stoop, kneel, crouch and crawl.  The claimant is further limited
   to simple, routine tasks with no fast-paced work, no strict production
   quotas, only simple work instructions and decisions, and minimal or
   infrequent changes in the work setting; and limited to occasional and
   superficial interaction with the public, coworkers, and supervisors.

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on January 6, 1980 and was 28 years old, which is
   defined as a younger individual age 18-49, on the alleged disability onset

date (20 CFR 404.1563 and 416.963).

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from January 15, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 16-17, 19, 27-28).

## V. Law and Analysis

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. (*Id.*) However, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in

15

the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).   Substantial evidence

is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A

decision supported by substantial evidence will not be overturned even though substantial

evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B.   Plaintiff's Assignments of Error**

   **1.   Treating Psychiatrist**

      In the first assignment of error, Plaintiff asserts that the ALJ erred by failing to set forth good

reasons for rejecting certain portions of Dr. Fikter's opinion, his treating psychiatrist. (R. 14,

PageID# 780-782).

      "Provided that they are based on sufficient medical data, 'the medical opinions and diagnoses

of treating physicians are generally accorded substantial deference, and if the opinions are

uncontradicted, complete deference.'" *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir.

2002) (quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985)).   In other words, "[a]n ALJ

must give the opinion of a treating source controlling weight if he finds the opinion

'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not

inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc.

Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoting* 20 C.F.R. § 404.1527(d)(2)).   Where an ALJ opts

to give a treating source's opinion less than controlling weight, the ALJ must give "good reasons"

for doing so that are "sufficiently specific to make clear to any subsequent reviewers the weight the

adjudicator gave to the treating source's medical opinion and the reasons for that weight." *See

Wilson*, 378 F.3d at 544 (*quoting* Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5).

The "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r*

*of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is "in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson*, 378 F.3d at 544 (*quoting Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

It is well-established that administrative law judges may not make medical judgments. *See Meece v. Barnhart*, 192 Fed. App'x 456, 465 (6th Cir. 2006) ("But judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.") (*quoting Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990)).   Although an ALJ may not substitute his or her opinions for that of a physician, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009).   "An example of a good reason is that the treating physician's opinion is 'unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence.'" *Conner v. Comm'r of Soc. Sec.*, 658 Fed. App'x 248, 253-254 (6th Cir. 2016) (*citing Morr v. Comm'r of Soc. Sec.*, 616 Fed. App'x 210, 211 (6th Cir. 2015)); *see also Keeler v. Comm'r of Soc. Sec.*, 511 Fed. App'x 472, 473 (6th Cir. 2013) (holding that an ALJ properly discounted the subjective evidence contained in a treating physician's opinion because it too heavily relied on the patient's complaints).

Specifically, Plaintiff takes issue with the ALJ's rejection of Dr. Fikter's opinion from April of 2015 that Plaintiff would be off task greater than twenty-five percent of the day; that Plaintiff could not sustain an eight hour work day, five days per week; that Plaintiff would be absent from work numerous days per month; and, that Plaintiff had marked to extreme limitations in his mental

ability to perform work related activities. (R. 14, PageID# 780, *citing* Tr. 705-707).

After summarizing much of Plaintiff's psychiatric treatment, the ALJ addressed Dr. Fikter's

opinion as follows:

> The claimant's psychiatrist, William Fikter, M.D., submitted a checkbox medical
> source statement form created by the claimant's representative.   He reported that
> the claimant's conditions are maintained on medication with no side effects
> (Exhibit 12F at 1).   He further noted that the claimant has an "extremely chaotic
> social situation" (Exhibit 12F at 1).   Dr. Fikter essentially indicated that the
> claimant is unable to work and would require an off-task allowance of greater
> than 25% of the work day and numerous absences per month because he cannot
> function at an 8-hour workday, 5 day work week pace (Exhibit 12Fat 1-2).   He
> further indicated that the claimant has marked to extreme limitations in abilities
> involving social functioning and concentration, persistence, or pace (Exhibit 12F at
> 2-3).   However, the course of treatment pursued by the doctor has not been
> consistent with what one would expect if the claimant were truly disabled, as the
> doctor has reported.   Indeed, the claimant reported to the doctor on multiple
> instances that he was working and the doctor did not indicate that the claimant
> should stop or need to take the additional breaks to maintain his mental health.   As
> stated above, the claimant had general improvement with medication, therapy, and
> AA attendance.   Moreover, Dr. Fikter generally did not note any objective
> abnormalities with the claimant's attention and concentration.   However, he did
> note that the claimant had a normal attention and concentration span in April and
> May of 2014 (Exhibit 10F at 45, 60).   Accordingly, Dr. Fikter's opinions were
> given little weight.
>
> ***
>
> In addition, the claimant has described daily activities that are not limited to the
> extent one would expect, given the complaints of disabling symptoms and
> limitations.   The claimant testified that he spends a typical day taking care of his
> children though he receives help from his father at times (Hearing Testimony).   In
> addition, on at least two occasions, the claimant spent several days working on his
> wife's car (Exhibit 10F at 23).   Even more, the record reflects work activity
> after the alleged onset date (Exhibit 4D at 1, 2E at 5-7, 10F at 7, 13).   Moreover,
> his position in 2008 ended not because of his conditions but for unrelated reasons
> (Exhibit 2E at 7).   Although that work activity did not constitute disqualifying
> substantial gainful activity, it does indicate that the claimant's daily activities have,
> at least at times, been somewhat greater than the claimant has generally reported.
>
> ***
>
> As for Global Assessment of Functioning (GAF) ratings, the claimant's

18

psychiatrist consistently rated the claimant with a GAF of 40 and the psychological consultative examiners rated the claimant at 51 and 53 (Exhibit 2F at 8, 4F, 5F at 9, 6F, 9F, 10F, 13F).   Although a GAF score can offer some evidence regarding the severity of the claimant's mental impairment, it is not dispositive on the issue.   A GAF score is a mere snapshot of the claimant's ability to function at the particular time of the assessment.   It includes factors such as legal, housing or financial problems that are not properly part of the disability analysis under the Social Security Act.   Furthermore, the Commissioner has declined to endorse the GAF scale for "use in Social Security and SSI disability programs," and has indicated GAF scores have no "direct correlation to the severity requirements [of the] mental disorders listings." *See* 65 Fed. Reg. 50746, 50764- 65 (August 21, 2000).   Moreover, the claimant's psychiatrists' consistent GAF rating of 40 is inconsistent with his record documenting improvement in these factors, as described above (Exhibit l0F, 11F).   Therefore, the undersigned gave the GAF ratings little weight.

(Tr. 23, 26-27).

The Court finds that the decision sets forth a sufficiently thorough explanation for ascribing little weight to Dr. Fikter's opinions as contained in the April 2015 assessment, and, taken as a whole, sets forth "good reasons" for doing so.

First, the ALJ expressly points out that Dr. Fikter's opinion was contained in a checkbox form that was created by Plaintiff's counsel. (Tr. 23).   "Supportability" is one of the factors specifically set forth in the regulations used to evaluate opinion evidence, and states that "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.   The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. §§ 404.1527(c), 416.927(c).   Several court decisions have found that the use of checklist or check-the-box forms, where little to no explanation is provided for the limitations set forth by the source, are unsupported and, therefore, need not be accepted even when completed by a treating source. *See, e.g., Kepke v. Comm'r of Soc. Sec.*, No. 15-1315, 636 Fed. App'x 625, 2016 WL 124140 at *4 (6th Cir. Jan. 12, 2016) ("Dr. Chapman's checklist opinion did not provide an

explanation for his findings; therefore, the ALJ properly discounted it on these grounds."); *accord Langlois v. Colvin*, No. 3:15-CV-01682, 2016 WL 1752853 at *8 (N.D. Ohio May 3, 2016) (Vecchiarelli, M.J.) (finding the ALJ did not err by rejecting a treating source's unexplained checklist opinion); *see also Hyson v. Comm'r of Soc. Sec.*, No. 5:12CV1831, 2013 WL 2456378, at *14 (N.D. Ohio June 5, 2013) (Burke, M.J.) (finding that because Dr. Martinez merely checked the boxes on the form while leaving those sections of the form blank where she was to provide her written explanation, she failed to provide any substantive basis for her conclusions and the ALJ was not required to accept her opinions); *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) ("We have held that the ALJ may 'permissibly reject[] ... check-off reports that [do] not contain any explanation of the bases of their conclusions.'") (citations omitted); *Smith v. Astrue*, 359 Fed. App'x 313, 316 (3d Cir. 2009) ("checklist forms ... which require only that the completing physician 'check a box or fill in a blank,' rather than provide a substantive basis for the conclusions stated, are considered 'weak evidence at best' in the context of a disability analysis.") (citations omitted); *cf. Price v. Comm'r SSA*, 342 Fed. App'x 172, 176 (6th Cir. 2009) ("Because Dr. Ashbaugh failed to identify objective medical findings to support his opinion regarding [claimant's] impairments, the ALJ did not err in discounting his opinion.")

Dr. Fikter's April 2015 opinion constitutes precisely the sort of opinion disfavored in the above cases.   It does little more than set forth Plaintiff's general diagnoses; states that Plaintiff has been on medication without side effects; opines that Plaintiff cannot work eight hours a day for five days a week[4] and predicts numerous absences per month; and proceeds to check boxes. (Tr. 705-707).   The opinion is devoid of any explanation for the assessed limitations. *Id.*   In keeping

---

[4] The closest approximation to an explanation is the psychiatrist's notation that Plaintiff "can't function at that pace/duration" when asked to comment whether Plaintiff can work eight hours a day, five days per week. (Tr. 705).

with the above case law, the ALJ could properly discount Dr. Fikter's April 2015 opinion on the grounds that the checklist opinion did not provide any explanation for his findings.

Furthermore, the ALJ gave additional reasons for discounting Dr. Fikter's opinion. These included the ALJ's observation that Dr. Fikter's course of treatment was not consistent with the marked and extreme limitations assessed by Dr. Fikter on the checkbox form. (Tr. 23). Plaintiff's dismisses this reason as "pure speculation." (R. 14, PageID# 781). While the Court concedes that at some point in construing a treating source's treatment notes an ALJ could impermissibly tread into the area of "playing doctor," the Court does not find that occurred herein. The ALJ's determination that Plaintiff generally improved with treatment (medication, therapy, and AA meetings) is a reasonable interpretation of the record. (Tr. 23). Plaintiff began treatment with Dr. Fikter in June of 2012. (Tr. 505-506). After some initial adjustments in Plaintiff's medications (Tr. 507, 510-514), treatment notes from January of 2013 and onwards frequently state that Plaintiff was calmer with less episodes of anger (Tr. 519), calmer than previously and more forthcoming (Tr. 520), progressively calmer with a decreasing risk assessment (Tr. 522), progressively calmer and more stable (Tr. 524-525), doing the same as previously despite being evicted and uncertain living arrangements (Tr. 526), and so forth. (Tr. 527-535, 598-599, 603-606.) Plaintiff contends that Dr. Fikter's treatment notes do not demonstrate overall improvement. (R. 14, PageID# 781). However, Plaintiff's mere disagreement with the ALJ's interpretation of the treatment notes or alternate interpretation of the treatment notes does not provide a basis for remand.

The ALJ also found that Dr. Fikter's treatment records failed to note any objective abnormalities with respect to Plaintiff's attention and concentration— an assertion that Plaintiff's brief does not challenge. (Tr. 23). Plaintiff does contend that the ALJ improperly discredited Dr.

Fikter's opinion based on the opinions of State Agency consulting doctors. (R. 14, PageID# 782). The ALJ's decision, however, is devoid of any statement suggesting that the ALJ was discounting Dr. Fikter's opinion because it was inconsistent with the opinions of non-treating sources.

Finally, reading the decision as a whole, it can be construed as discounting Dr. Fikter's April 2015 assessment due to Plaintiff's instances of working and daily activities. (Tr. 23, 26). Plaintiff contends that these instances are isolated and do not demonstrate the ability to engage in substantial gainful activity ("SGA"). (R. 14, PageID# 781). However, the significance of Plaintiff reporting working to Dr. Fikter, according to the ALJ, was not that it demonstrated an ability to engage in SGA *per se*. Rather despite Dr. Fikter's awareness of Plaintiff working, his treatments notes do not indicate that he believed Plaintiff was unable to work, that Plaintiff should limit his work, or that Plaintiff should refrain from working. (Tr. 23).

In sum, the Court finds that Plaintiff's first assignment of error is without merit, as the ALJ set forth numerous, good reasons for ascribing little weight to Dr. Fikter's April 2015 mental RFC assessment.

## 2. Step Five

In the second assignment of error, Plaintiff asserts that given the ALJ's RFC determination, the record does not support a finding that he is capable of performing a significant number of jobs. (R. 14, PageID# 783-784).

At the fifth and final step of the disability analysis, if a claimant cannot perform his or her past relevant work, it must be determined whether the claimant can make an adjustment to other work in light of the claimant's RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this final step, the burden shifts to the Commissioner to prove the existence of a significant number of jobs in the national economy that a person with the

claimant's limitations could perform. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999); *accord White v. Comm'r of Soc. Sec.*, 312 Fed. App'x 779 (6th Cir. 2009).  An ALJ's finding in this regard must be supported by substantial evidence (*i.e.* that the claimant has the vocational qualifications to perform specific jobs). *Workman v. Comm'r of Soc. Sec.*, 105 Fed. App'x 794, 799 (6th Cir. 2004) (*citing Varley v. Sec'y of Health & Varley*, 820 F.2d 777, 779 (6th Cir. 1987)).

Testimony from a vocational expert—in response to a hypothetical question—may constitute substantial evidence that a claimant retains the ability to perform specific jobs, so long as the hypothetical question accurately accounts for a claimant's physical and mental impairments. *See, e.g., Pasco v. Comm'r of Soc. Sec.*, 137 Fed. App'x 828, 845 (6th Cir. 2005) (*citing Varley*, 820 F.2d at 779)).  However, "[t]he rule that a hypothetical question must incorporate all of the claimant's physical and mental limitations does not divest the ALJ of his or her obligation to assess credibility and determine the facts." *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. App'x 425, 429 (6th Cir. 2007) (*quoting Redfield v. Comm'r of Soc. Sec.*, 366 F. Supp.2d 489, 497 (E.D. Mich. 2005)).  In other words, when an ALJ presents hypothetical question(s) to the VE, the ALJ is required to incorporate only those limitations that have been accepted as credible. *Griffeth*, 217 Fed. App'x at 429 (*citing Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

In the ultimate RFC finding, in addition to limiting Plaintiff to light work with a number of other physical limitations, the ALJ found that Plaintiff's mental impairments limited him to "simple, routine tasks with no fast-paced work, no strict production quotas, only simple work instructions and decisions, and minimal or infrequent changes in the work setting; and limited to **occasional and superficial interaction with the public, coworkers, and supervisors**." (Tr. 19) (emphasis added).

Plaintiff acknowledges that the VE, in response to the ALJ's hypothetical question incorporating the above limitations and restrictions, initially identified a number of jobs. (R. 14, PageID# 783-784).   Plaintiff contends, however, that after further reflection when questioned by counsel, the VE ostensibly proceeded to eliminate all the previously identified jobs. (*Id.*, *citing* Tr. 60-61).   Plaintiff, therefore, asserts that the ALJ ignored the VE's changed testimony when rendering the decision, resulting in a Step Five determination that is unsupported by substantial evidence. (*Id.*)

At the June 25, 2015 hearing, the ALJ posed the following hypothetical question to the VE:

> I'd for you assume a hypothetical individual with Mr. Smith's vocational profile who is limited to performing light work as defined under the regulations, except that he should never climb ladders, ropes or scaffolds; and occasionally climb ramps or stairs, stoop, kneel, crouch and crawl.   The individual is further limited to simple, repetitive well, I'll just say simple routine tasks with no fast paced work and no strict production quotas; only simple work instructions and decisions; and minimal changes in the work setting, minimal or infrequent changes in the work setting; and finally, the individual is limited to occasional and superficial interaction with the public, coworkers and supervisors. Given those limitations, do jobs exist in the regional and national economies that such a hypothetical individual could perform?

(Tr. 58).

The VE testified that such an individual could perform a number of jobs, and identified the following positions as examples: merchandise marker, Dictionary of Occupational Titles ("DICOT") 209.587-034, which is light, unskilled with an SVP of 2 (167,000 jobs nationally, 1,500 in Ohio); housekeeping cleaner, DICOT 323.687-014, which is light, unskilled with an SVP of 2 (127,000 jobs nationally; 1,300 in Ohio); mailroom clerk, DICOT 209.687-026, which is light, unskilled with an SVP of 2 (105,000 jobs nationally, 900 in Ohio). (Tr. 58-59).

The ALJ posed a second hypothetical asking the VE to keep the same restrictions as in the first, but at the sedentary exertional level. (Tr. 59).   The VE responded that such an individual

could perform a number of jobs, and identified the following positions as examples: document

preparer, DICOT 249.587-018, which is sedentary, unskilled with an SVP of 2 (70,000 jobs

nationally, 750 in Ohio); addresser, DICOT 209.587-010, which is sedentary, unskilled with an

SVP of 2 (3,900 jobs nationally, 20 in Ohio); and, press clipping cutter and paster, DICOT

249.587-014, which is sedentary, unskilled with an SVP of 2 (4,000 jobs nationally, 50 in Ohio).

(*Id.*)   The VE indicated that her testimony was consistent with the DICOT. (*Id.*)

 Thereafter, Plaintiff's attorney engaged in the following exchange:

 Atty: I'm just curious, because a lot of, a lot of vocational experts tell me that, that occasional superficial interaction with a supervisor is just not consistent with competitive employment.   Is that something that you considered?

 ALJ : At the sedentary level you mean or all over?

 Atty: At all over.

 VE: I know what they're talking about, **I don't agree**.

 Atty: And, and you could have superficial contact with a supervisor --

 VE: You can.

***

 Atty: … I mean, if they have to criticize you it's, it's, it's not superficial.

***

 VE: **I see their logic, but I don't agree.   I, I just don't think you can rule out supervision because the contact is superficial.**   Well, let me think about that for a minute.

***

 VE: So, it's superficial contact with a supervisor and, and other VE's say it's not possible. Well, okay, what I can say is that you can't control for it, that's all, you can't control for it.   So, to be on the safe side you would rule it out.

 Atty: OK.

25

(Tr. 60-61) (emphasis added).

The ALJ indicated that "Counsel has a valid point," and posed a third hypothetical, removing the word "superficial" from the prior hypotheticals and leaving occasional interaction with the public, coworkers and supervisors. (Tr. 61).   The VE testified that the previously identified jobs would remain.[5]  (*Id.*)

While the Court acknowledges that Plaintiff's interpretation of the testimony—that the VE essentially changed her mind—is not implausible, the Court cannot find that Plaintiff's interpretation of the VE's testimony is the only reasonable interpretation or that it is even the most compelling interpretation.   The VE repeatedly stated that she did not agree with the proposition that superficial interaction with supervisors eliminates all jobs where supervision is necessary. The above dialogue was addressing the viewpoint of some other VEs, when the VE in the case at bar stated "you can't control for it.   So, to be on the safe side you would rule it out." (Tr. 61). While Plaintiff believes this reflects the VE unambiguously coming around to counsel's point of view and ruling out the availability of any jobs, the Court disagrees.   The VE never testified that she herself was ruling out the availability of any jobs involving superficial contact.   Rather, one can just as reasonably interpret the VE's statement that "to be on the safe side you would rule it out" as an expression of her understanding as to the position of the other VEs that Plaintiff's counsel mentioned.   Given the VE's rather unequivocal statement immediately preceding the exchange that she disagrees with that point of view, the Court cannot find the ALJ erred by continuing to credit the VE's testimony that a person with the claimant's RFC could perform the jobs of a merchandise marker, housekeeping cleaner, and mailroom clerk.   The Court cannot find

---

[5]  Ultimately, the ALJ appears to have opted against removing the word "superficial" from the RFC determination or inadvertently failed to do so. (Tr. 19).

that ALJ's resolution of any ambiguity was unreasonable, especially given that the ALJ was present at the hearing while the Court is left only with a transcript.   Furthermore, Plaintiff has cited no authority suggesting that a remand is necessary where a VE's testimony is susceptible to varying interpretations.

Finally, in response to the ALJ's third hypothetical, the VE clearly testified that the same three jobs would remain even if superficial contact was removed and contact remained occasional. (Tr. 61).   As such, Plaintiff's argument—that there is insufficient evidence to show that Plaintiff can perform a significant number of jobs in the national economy—is untenable.   Even if the ALJ had intended to omit the term "superficial" from the RFC finding but inadvertently failed to do so, any ensuing error is rendered harmless by the VE's testimony in response to the third hypothetical, as that testimony would constitute substantial evidence on which the ALJ could reasonably rely. Therefore, a remand would be futile.[6]

As such, the Court finds Plaintiff's second assignment of error to be without merit.

## IV.   Conclusion

For the foregoing reasons, it is recommended that the Commissioner's final decision be AFFIRMED.

s/ *David A. Ruiz*

David A. Ruiz
United States Magistrate Judge

Date: February 24, 2017

---

[6] "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (*quoting Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989)); *see also Kobetic v. Comm'r of Soc. Sec.*, 114 Fed. App'x 171, 173 (6th Cir. 2004) (When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.") (*quoting NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766, n.6, 89 S. Ct. 1426, 22 L. Ed. 2d 709 (1969)).

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.   Failure to file objections within the specified time may waive the right to appeal the District Court's order.   *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).   *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).